UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

CHURCH & DWIGHT CO., INC.,      :

         Plaintiff,      :

     -against-      :

THE CLOROX COMPANY,      :

         Defendant.      :

-------------------------------------------------------------X

Civil Action No.: 11 Civ. 1865 (JSR)

## DEFENDANT'S POST-HEARING MEMORANDUM OF LAW IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Jessie F. Beeber
Edward H. Rosenthal
Marisa Sarig
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue, 10th Floor
New York, NY 10022
Tel.: (212) 980-0120
Fax: (212) 593-9175

*Attorneys for Defendant*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT .............................................................................. 1

ARGUMENT ........................................................................................................... 2

POINT I     PLAINTIFF HAS NOT PROVEN THAT THE CLAIM "CARBON IS MORE EFFECTIVE AT ABSORBING ODORS THAN BAKING SODA" IS LITERALLY FALSE ............................................................. 2

    A.    The Commercial Is Literally True ....................................................... 2

    B.    The Commercial Is Not False By "Necessary Implication" .................... 3

    C.    C&D Has Not Submitted Any Consumer Perception or Other Evidence that the Commercial Is Literally True, But Misleading .......................... 7

POINT II    THE JAR TEST IS RELIABLE AND VALID, AND THUS PROPERLY SUBSTANTIATES THE COMMERCIAL'S CLAIMS ......................... 8

    A.    The Jar Test Is Sufficiently Reliable to Substantiate the Claim that Carbon is Better at Absorbing Cat Waste Malodor than Baking Soda ............... 9

        1.    Sensory Evaluation is a Valid Means to Measure Cat Waste Malodor Absorption ...................................................................... 9

        2.    C&D Has Not Proven that the Clorox Panel Was Trained or Validated Improperly ........................................................... 10

        3.    C&D Has Not Shown that the Validation of the Panel Created Any Bias ..................................................................................... 12

        4.    C&D Has Not Shown that the Jar Test Was Administered Improperly ................................................................................ 14

        5.    Clorox's Design and Supervision of the Jar Test Does Not Render it Unreliable ............................................................................. 16

        6.    No Adverse Inference May Be Drawn from the Absence of First-Hand Testimony about the Actual Conduct of the Jar Test ............ 17

        7.    There is an Acceptable Level of Variation in all of the Jar Test Results ................................................................................... 18

B. The Jar Test Is Valid Because it is Directly Relevant to the Claim in the Commercial that Carbon is Better Than Baking Soda at Absorbing Cat Waste Malodor ........................................................................................... 22

    1. Dr. Miller Admits that Carbon Does Absorb Odors Better Than Baking Soda In "General" Use ............................................................... 24

    2. The Speculative Testimony of Dr. Miller on the Performance of Carbon in Clorox's Litter Should be Disregarded or Afforded Little Weight ...................................................................................... 25

C. The Dramatization Accurately Depicts the Relative Efficacies of Carbon and Baking Soda at Absorbing Cat Waste Malodor ............................................. 29

CONCLUSION ................................................................................................................... 31

## TABLE OF AUTHORITIES

**Page**

### Cases

*Am. Home Prods. Corp. v. Johnson & Johnson,*
   577 F.2d 160 (2d Cir. 1978)..................................................................................... 2

*Armstrong v. Commerce Tankers Corp.,*
   311 F. Supp. 1236 (S.D.N.Y. 1969)...................................................................... 18

*Avis Rent A Car System, Inc. v. The Hertz Corp.,*
   782 F.2d 381 (2d Cir. 1986).................................................................................. 21

*Bank of Crete, S.A. v. Koskotas,*
   733 F. Supp. 648 (S.D.N.Y. 1990) ....................................................................... 18

*Castrol Inc. v. Pennzoil Co.,*
   987 F.2d 939 (3d Cir. 1993).............................................................................. 5, 7

*Castrol, Inc. v. Quaker State Corp.,*
   977 F.2d 57 (2d Cir. 1992)................................................................................ 2, 9

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,*
   No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982)........................... 4

*Domingo ex rel. Domingo v. T.K.,*
   289 F.3d 600 (9th Cir. 2002) ............................................................................... 28

*eBay Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006)............................................................................................. 33

*Faryniaz v. Nike, Inc.,*
   No. 00 CIV. 2623 (NRB), 2002 WL 1968351 (S.D.N.Y. Aug. 23, 2002) ............... 27

*Folio Impressions, Inc. v. Byer California,*
   752 F. Supp. 583 (S.D.N.Y. 1990) ....................................................................... 11

*Four Star Capital Corp. v. Nynex Corp.,*
   183 F.R.D. 91 (S.D.N.Y. 1997)............................................................................ 11

*Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.,*
   No. 95 CIV. 7686 (CSH), 1997 WL 543086 (S.D.N.Y. Sept. 4, 1997) ................. 11

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997)............................................................................................. 28

*Gillette Co. v. Norelco Consumer Prods. Co.*,
    946 F. Supp. 115 (D. Mass. 1996) ................................................................. 17, 31

*Gillette Co. v. Wilkinson Sword, Inc.*,
    89 CV 3586 (KMW), 1991 U.S. Dist. LEXIS 21006 (S.D.N.Y. Jan. 9, 1991) ......................... 4

*Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992) ................................................................. 2, 7

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*,
    348 F. Supp. 2d 165 (S.D.N.Y. 2004) ................................................................. 17

*L&F Prods., a Div. of Sterling Winthrop, Inc. v. Procter & Gamble, Co.*,
    845 F. Supp. 984 (S.D.N.Y. 1999) ................................................................. 31

*McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.*,
    938 F.2d 1544 (2d Cir. 1991) ................................................................. 23

*McNeil-PPC, Inc. v. Pfizer Inc.*,
    351 F. Supp. 2d 226 (S.D.N.Y. 2005) ................................................................. 9

*Munchkin, Inc. v. Playtex Prods., LLC*,
    No. CV 11-00503 AHM (RZx), 2011 WL 2174383 (C.D. Cal. Apr. 11, 2011) ...................... 23

*Osmose, Inc. v. Viance, LLC*,
    612 F.3d 1298 (11th Cir. 2010) ................................................................. 23

*Piper Aircraft Corp. v. Wag-Aero, Inc.*,
    741 F.2d 925 (7th Cir.1984) ................................................................. 11

*Playtex Prods., Inc. v. Gerber Prods. Co.*,
    981 F. Supp. 827 (S.D.N.Y. 1997) ................................................................. 17

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    No. 02 Civ. 8046 (WHP), 2003 WL 21242769 (S.D.N.Y. May 28, 2003) ...................... 27

*Procter & Gamble Co. v. Chesebrough-Pond's, Inc.*,
    747 F.2d 114 (2d Cir. 1984) ................................................................. 31

*Procter & Gamble Co. v. Colgate-Palmolive Co.*,
    96 CIV. 9123 (RPP), 1998 WL 788802 (S.D.N.Y. Nov. 9, 1998) ...................... 11

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
    760 F. Supp. 2d 446 (S.D.N.Y. 2011) ................................................................. 33

*Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A.*,
    32 F.2d 209 (2d Cir. 1929) ................................................................. 18

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010).................................................................................... 33

*Santoro ex. rel. v. Donnelly,*
    340 F. Supp. 2d 464 (S.D.N.Y. 2004)..................................................................... 28

*Schering Corp. v. Pfizer, Inc.,*
    189 F.3d 218, 229 (2d Cir. 1999)............................................................................. 2

*Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.,*
    702 F. Supp. 2d 266 (D. Del. 2010)........................................................................ 23

*Scotts Co. v. United Indus. Corp.,*
    315 F.3d 264 (4th Cir. 2002) ..................................................................................... 3

*Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.,*
    198 F. Supp. 2d 59 (D. Mass. 2002) ....................................................................... 24

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
    497 F.3d 144 (2d Cir. 2007)......................................................................... 2, 3, 7, 8

*U.S. v. Glynn,*
    578 F. Supp. 2d 567 (S.D.N.Y. 2008)..................................................................... 31

*U.S. v. Sutton,*
    795 F.2d 1040 (Temp. Emer. Ct. App. 1986) ........................................................ 11

*Zaremba v. Gen. Motors Corp.,*
    360 F.3d 355 (2d Cir. 2004)................................................................................... 27

*Zeneca Inc .v Eli Lilly & Co.,*
    No. 99 CIV. 1452 (JGK), 1999 WL 509471 (S.D.N.Y. July 19, 1999) .............. 8, 22

**Rules**

Rule 602 of Federal Rules of Evidence ........................................................................ 11

Rule 702 of Federal Rules of Evidence ........................................................................ 28

Defendant Clorox Pet Products Company ("Clorox"), incorrectly sued herein as The Clorox Company, respectfully submits this post-hearing memorandum of law in further opposition to Plaintiff Church & Dwight Co., Inc.'s ("Plaintiff" or "C&D") motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Consumers have a right to know that carbon is better than baking soda at absorbing cat waste malodor. C&D has not met the extraordinary burden necessary to enjoin Clorox from running a commercial that accurately communicates this fact. Despite numerous opportunities to present relevant evidence to this Court, including at an evidentiary hearing held after its request, C&D has not adduced any evidence to show that the Jar Test is unreliable or invalid, nor has it introduced any consumer perception or other evidence to show that the Commercial is misleading or deceptive in any way.

Clorox has established that sensory evaluation is a valid means to measure cat waste malodor, that the panelists who participated in the Jar Test that tested the efficacy of carbon and baking soda were properly trained and validated, that the Jar Test was properly administered, and that the results were correctly analyzed. C&D's unsupported attacks on Clorox's evidence and methodology and its assaults on the integrity of Clorox and its employees (who stand accused, based on no evidence, of breaking the blind of the study, "stack[ing] the deck" and putting their "thumb on the scale") are not sufficient to meet its heavy burden.

C&D's motion for a preliminary injunction must be denied.

## ARGUMENT

## POINT I

### PLAINTIFF HAS NOT PROVEN THAT THE CLAIM "CARBON IS MORE EFFECTIVE AT ABSORBING ODORS THAN BAKING SODA" IS LITERALLY FALSE

On this motion, C&D bears the burden of proving a likelihood of success on its false advertising claim. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir. 1992). Because C&D has introduced no evidence of consumer confusion, it must prove that the Commercial is literally false. *See, e.g., Am. Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165-66 (2d Cir. 1978) (unless an advertisement is held to be literally false, a plaintiff can only prevail if it produces evidence of consumer deception or confusion); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007) ("a district court *must* rely on extrinsic evidence of [consumer deception or confusion] to support a finding of an implicitly false message") (emphasis and brackets in original) (quoting *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)); *see also Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992) ("Where, as here, a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers.").

#### A.    The Commercial Is Literally True

The claims in the Commercial are unambiguously clear.  In reaction to C&D's relentless campaign regarding the effectiveness of its Arm & Hammer baking soda at eliminating cat waste odors, Clorox set out to communicate one simple message to consumers:  carbon is more effective than baking soda at absorbing cat waste malodor.  The Commercial thus states:  **"[W]e make Fresh Step Scoopable litter with carbon, which is more effective at absorbing odors than baking soda."**  *See* Declaration of Jay Stilwell, dated March 24, 2011 ("Stilwell Decl."),

2

Ex. E.  It then visually dramatizes the results of the Jar Test, with an accompanying super that

reads **"Dramatization of cat waste malodor after 1 day.  Based on sensory lab test."** (the

"Dramatization").  Thus, the literal message of the Commercial is that carbon is more effective

than baking soda at absorbing cat waste malodor, a fact amply proven by the Jar Test.

**B.      The Commercial Is Not False By "Necessary Implication"**

Because the Commercial does not contain any explicit statement regarding Arm &

Hammer litter's ineffectiveness, Fresh Step litter's superiority, or any litter to litter comparison,

C&D must rely on the doctrine of "necessary implication" to make out its literal falsity claim.

*See* Pl.'s Hr'g Mem. at 2-3.  Under this doctrine, a message is conveyed by necessary implication

only if it is unambiguous, that is "when, considering the advertisement in its entirety, the

audience would recognize the claim as readily as if it had been explicitly stated." *Time Warner*

*Cable, Inc.*, 497 F.3d at 158 (citations omitted).  Thus, this doctrine only applies when *the only*

*possible* interpretation of the advertisement is the one proffered by the plaintiff.  Where the

advertisement "can reasonably be understood as conveying different messages," plaintiff's literal

falsity argument must fail. *Time Warner*, 497 F.3d at 158 (citing *Scotts Co. v. United Indus.*

*Corp.*, 315 F.3d 264, 274-75 (4th Cir. 2002) (finding that plaintiff's convoluted explanation of

the meaning of a graphic – which was at odds with the express language of the ad – was not

*necessarily* conveyed by the ad)).

Here, there simply is no basis to conclude that the Commercial unambiguously contains

the messages C&D claims.  In fact, this Court need not look further than C&D's own shifting

description of what the Commercial supposedly means.  C&D has identified what it contends the

numerous literal messages of the Commercial to be:  "(i) that Arm & Hammer cat litter products

containing baking soda are less effective (in fact, significantly less effective) than Fresh Step at

reducing cat waste malodor and (ii) that Arm & Hammer cat litters with baking soda are only

minimally effective against cat waste odors," Plaintiff's Memorandum of Law in Support of
Motion for Preliminary Injunction and Expedited Discovery ("Pl.'s Inj. Mem.") at 6; that the
Commercial "goes so far as to depict Arm & Hammer baking soda litters as almost completely
ineffective," *id.* at 2, and that it is "crystal clear that the Commercial's intended message is that
Clorox's Fresh Step litter is superior to Arm & Hammer litter in odor elimination because of the
presence of carbon in Fresh Step litter," Plaintiff's Post-Preliminary Injunction Hearing
Memorandum of Law ("Pl.'s Hr'g Mem.") at 6. Plainly the "necessary implication" doctrine
cannot apply when the plaintiff proffers numerous interpretations of the message supposedly
conveyed by the Commercial.

Moreover, the "necessary implication" cases C&D cites from this Circuit all involve
situations where an advertiser seeks refuge in the literal meaning of the words in its ad, but
where it also would defy common sense to understand the statement that way. For example, in
*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ. 731-CSH, 1982 WL 121559, at *1-2
(S.D.N.Y. June 9, 1982), Robot-Coupe headlined a print advertisement for its food processor
"Robot-Coupe: 21 Cuisinart: 0," and then stated in a sub-headline that "when all 21 of the three-
star restaurants in France's Michelin Guide choose the same professional model, somebody
knows the score – shouldn't you?" The court held that the advertisement, while literally true,
because all of those restaurants did in fact use Robot-Coupe professional model food processors,
necessarily implied that the restaurants were choosing Robot-Coupe's professional model food
processor over Cuisinart's professional model (even though it did not explicitly say that). Since
Cuisinart did not even manufacture a professional model food processor, the court held that the
statement was false. *Id.* at *2. Similarly, in *Gillette Co. v. Wilkinson Sword, Inc.*, 89 CV 3586
(KMW), 1991 U.S. Dist. LEXIS 21006, at *12-13 (S.D.N.Y. Jan. 9, 1991), the court held that the
defendant's claim that its shaving product was "six times smoother" necessarily implied to

consumers that the smoothness related to the shave itself, and not, as the advertiser claimed, literally to the smoothness of the product's lubricating strip.

The Third Circuit case C&D relies on, *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993), applies the necessary implication doctrine in a much more limited fashion, using it as a tool to determine whether general superiority statements were actionable false advertising, or only mere puffery.

Pennzoil's advertisement in that case literally stated that its motor oil "outperform[ed] any leading motor oil against viscosity breakdown" and also claimed, without specific mention of competitors, that the motor oil generally provided "longer engine life and better engine protection." *Id.* at 942, 946. The Third Circuit affirmed the district court's holding that the statement "outperforms any leading motor oil against viscosity breakdown" was literally false, because the testing Pennzoil and Castrol both submitted did not support that claim. *Id.* at 943-44. The court then analyzed the more general statements in the advertisement of "longer engine life and better engine protection." *Id.* at 945-46. Applying the doctrine of necessary implication, the court rejected the argument that "Pennzoil's failure to specifically mention its competitors in the sentence promoting engine protection . . . render[ed] the statement puffery." *Id.* at 946. It instead adopted the district court's conclusion that "the statement compared Pennzoil to its major competitors by necessary implication," because of the explicit reference to "leading motor oil[s]" in the viscosity claim. *Id.*

That limited holding with respect to puffery has no application to this case. Clorox has never claimed that the statement at issue here ("[W]e make Fresh Step Scoopable litter with carbon, which is more effective at absorbing odors than baking soda.") or the Commercial's visual dramatization of the Jar Test is puffery. Moreover, the Commercial, unlike the ad in *Pennzoil*, contains no explicit references to other brands.

In short, the necessary implication doctrine permits a court, in certain limited circumstances, to prevent an advertiser from relying on the literal words of its ad when those words necessarily have an entirely different, and unambiguous, meaning.  Even though it did not explicitly say so, Robot-Coupe's reference to food processors could only mean professional food processors, Wilkinson Sword's claim of smoothness had to refer to shaving smoothness, not the smoothness of the lubricating strip, and Pennzoil's reference to "longer engine life and better engine protection" could not be puffery, because it could only mean "longer" and "better" as compared to other leading motor oils.

Here, C&D claims that the Commercial's explicit comparison of carbon versus baking soda should be read to necessarily imply a host of other messages, including that cat litters with baking soda are less effective, that all Fresh Step litters are superior to all Arm & Hammer litters, or that Arm & Hammer litters are barely effective.[1]  In other words, C&D's argument changes the message of the Commercial entirely, without a basis in the rest of the ad, stretching the doctrine of necessary implication far beyond its boundaries.  C&D simply cannot successfully argue that the Commercial has some other meaning without submitting consumer perception evidence to support that claim.

---

[1] Clorox has previously submitted evidence sufficient to substantiate that those statements, if contained in the Commercial, are true.  Given the limitations set by the Court for the Hearing and this post-hearing submission, however, Clorox will not reiterate here the methodology and results of its litter testing, which establishes the superiority of its litter products for cat waste malodor control.  *See, e.g.*, Def.'s Mem. of Law in Opposition to Pl.'s Mot. for a Prelim. Inj. ("Def.'s Opp. Mem.") at 4-5, 15; Declaration of Jodi Russell, dated Mar. 24, 2011 ("Russell Decl."), ¶¶ 18-33.  Moreover, to the extent C&D is arguing that Clorox is making a product superiority claim, it cannot maintain that any such claim is an "establishment claim" because the Commercial does not state that "tests prove" any such overall litter superiority.  C&D would then have the burden to prove that its litter products were equal or superior on an overall basis to those produced by Clorox, a burden which it has not met on this record.  *Castrol, Inc.*, 977 F.2d at 63.

**C.   C&D Has Not Submitted Any Consumer Perception or Other Evidence that the Commercial Is Literally True, But Misleading**

At the Hearing, this Court suggested that if a statement in an advertisement was "literally true, but fail[ed] to reveal the other facts that would give it a totally different meaning," it would be literally false, regardless of consumer perception.  Transcript of Hearing held June 17, 2011 ("Tr.") 175:7–176:18.  This Court analogized that situation to the "thou shalt disclose" rule in securities law, which mandates that literally true statements that fail to disclose material facts are actionable half-truths.  *Id.*

First, the Commercial is not a literal half-truth in any respect, because it does not hide any material information regarding the carbon versus baking soda comparison.  Moreover, from a legal standpoint, the fact scenario that the Court describes – where a statement is not literally false, but is instead potentially misleading – is exactly the type of case where the plaintiff has the burden of coming forward with consumer perception evidence to show how the advertisement is perceived.  Indeed, in *Time Warner Cable*, the Second Circuit distinguished false advertising cases from those arising under securities law on this basis, observing that:

> A court may, of course, construe and parse the language of the advertisement.  It may have personal reactions as to the defensibility or indefensibility of the deliberately manipulated words.  It may conclude that the language is far from candid and would never pass muster under tests otherwise applied – for example, the Securities Acts' injunction that "thou shalt disclose"; but the court's reaction is at best not determinative and at worst irrelevant.  *The question in such cases is – what does the person to whom the advertisement is addressed find to be the message?*

497 F.3d at 156 (emphasis in original) (quoting *Am. Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F. Supp. 1357 (S.D.N.Y. 1976)); *see also Johnson & Johnson-Merck Consumer Pharm. Co.*, 960 F.2d at 297-98 (to establish implied messages, court cannot substitute its own intuitive reaction for extrinsic evidence).

Finally, the literal half-truth scenario articulated by the Court is not, as C&D suggests, a case of literally false by necessary implication. *See* Pl.'s Hr'g Mem. at 3 n.3. As discussed above, a statement is false by necessary implication if it is literally true, but can only be understood in a way that makes it false. *See Time Warner Cable, Inc.,* 497 F.3d at 158. In the Court's example, the statement of "half-truth" did not necessarily imply something else that was false, it instead failed to include some salient fact.

In sum, the Commercial is not literally false. Therefore, because C&D has failed to introduce any evidence of consumer confusion or deception, and because Clorox's testing demonstrates that carbon absorbs cat waste malodor better than baking soda, C&D's motion for a preliminary injunction must be denied.[2]

**POINT II**

**THE JAR TEST IS RELIABLE AND VALID, AND THUS PROPERLY
SUBSTANTIATES THE COMMERCIAL'S CLAIMS**

In order to obtain an injunction in this case, C&D must prove "either (i) 'that the tests [Clorox relies on] were not sufficiently reliable to permit [the] conclusion' for which they are cited, or (ii) 'that the tests, even if reliable, do not establish the proposition asserted by the defendant' and are thus 'simply irrelevant.'" *Zeneca Inc .v Eli Lilly & Co.*, No. 99 CIV. 1452 (JGK), 1999 WL 509471, at \*32 (S.D.N.Y. July 19, 1999) (granting preliminary injunction

---

[2] C&D argues, citing dicta in certain of the false by necessary implication cases, that Clorox's intent with respect to the Commercial is probative of the Commercial's literal meaning. An advertiser's intent should not be relevant to the question of whether a particular statement is literally false, or whether it must necessarily be read as conveying something false, because such a question turns only on the unambiguous meaning of the advertisement as broadcast. In any event, C&D has not produced any evidence with respect to Clorox's intent other than certain email communications to and from Clorox's advertising agency, such as those shown to Ms. Russell at the Hearing, which do not contradict the unambiguous message of the Commercial and which the Court correctly found to be irrelevant to the issues now before it. Tr. 286:3–287:9.

8

where studies were insufficient to support advertiser's claim that its drug was proven to reduce breast cancer and was equal or superior to a competing product) (quoting *Castrol, Inc.*, 977 F.2d at 63); *see also McNeil-PPC, Inc. v. Pfizer Inc.*, 351 F. Supp. 2d 226, 250-51 (S.D.N.Y. 2005) (granting preliminary injunction because studies relied upon neither supported advertiser's claim nor were sufficiently reliable).  C&D has made no such showing here, and its motion must be denied.

**A.     The Jar Test Is Sufficiently Reliable to Substantiate the Claim
that Carbon is Better at Absorbing Cat Waste Malodor than Baking Soda**

On the first prong of the test, C&D has failed to prove that the Jar Test is "not sufficiently reliable to permit one to conclude with reasonable certainty that [it] established the proposition for which [it was] cited." *McNeil-PPC*, 351 F. Supp. 2d at 250-51 (citing *Castrol, Inc.*, 977 F.2d at 62-63).  As set forth below, the methodology, implementation, and results of the Jar Test are reliable and serve as adequate and appropriate substantiation for the claim in the Commercial.

**1.     Sensory Evaluation is a Valid Means to Measure Cat Waste Malodor
Absorption**

The Jar Test used a trained sensory evaluation panel to measure the ability of carbon and baking soda to absorb cat waste malodor.  Sensory evaluation is a discipline "based on experimental psychology [that] measures the responses of animals or humans to different stimulants."  Tr. 77:15-17 (Civille).  C&D's witness, Dr. Daniel Ennis, agrees that although some properties of odor can be measured using instrumental testing, sensory evaluation is the only way to measure the combined properties of odor in the way that it is perceived by humans.  Tr. 12:12-13 (Dr. Ennis testifying that "people can often detect things that instruments cannot do . . . ."); *see also id.* at 81:9-82:1 (Civille).

Sensory evaluation is taught at over 40 universities in the United States.  Tr. 85:23-25 (Civille).  It is the subject of textbooks and peer-reviewed journals such as the Journal of Sensory

Science. *Id.* at 86:1-13 (Civille); 205:9-206:1 (Carr). Its methodologies are used across

industries to support research and development and to substantiate claims in advertising. *Id.* at

86:20-25 (Civille); Declaration of Gail Vance Civille, dated April 1, 2011 ("Civille Decl."), ¶¶ 4,

6-7.

Significantly, C&D does not dispute the use of sensory evaluation as support for the

claim contained in the Commercial. *See, e.g.,* Declaration of Raymond S. Brown, dated March

16, 2011, ¶¶ 15-23 (describing C&D testing that relies on sensory evaluation testing). Sensory

evaluation, as this Court noted, is "a legitimate field, legitimate approach to testing." Tr. 141:20-

22.

### 2. C&D Has Not Proven that the Clorox Panel Was Trained or Validated Improperly

In sensory evaluation, the panel is the instrument, not the individual panelist. *See*

Supplemental Declaration of B. Thomas Carr, dated April 5, 2011 ("Carr Suppl. Decl."), ¶ 8.

Before a panel is used for evaluation, its members go through a rigorous training, validation and

calibration process. Russell Decl. ¶ 13 & Ex. B at D00006-08; Civille Decl. ¶¶ 10-12.

C&D has not established any flaws in the methodology used to train and validate the Jar

Test panel. Sensory Spectrum, an independent company specializing in the design and

implementation of methodologies for sensory evaluation, designed the protocol used to train and

validate the panel. Civille Decl. ¶ 2; Russell Decl. Ex. B. Contrary to C&D's assertion that it "is

not clear who specifically conducted the original 2008 training and validation of the Clorox

panelists," Pl.'s Hr'g Mem. at 21, Gail Vance Civille, the president of Sensory Spectrum,

testified that Sensory Spectrum employees trained the panelists. Tr. 89:23-90:1. Ms. Civille was

familiar with that training based on her review of her company's protocol design and reports

from those present at the training. *Id.* at 119:12-13. Although C&D argues that Ms. Civille

cannot provide meaningful testimony as to the training of the panel, the type of supervision she performed amounts to personal knowledge under Rule 602 of the Federal Rules of Evidence.[3] Thus, this Court may accept Ms. Civille's testimony as to how the panel was trained. *See, e.g.*, Civille Decl. ¶¶ 10-14; Tr. 88:6-90:7; 95:1-11; 100:8-101:3; 108:3-109:13; 111:23-112:12.

The panelists were trained to use the SPECTRUM[TM] Method, which Ms. Civille devised. Civille Decl. ¶¶ 6, 10. Pursuant to the training protocol, the panelists (after being screened for acuity and availability) became familiar with the testing procedures and facilities. Russell Decl., Ex. B at D00007. They were also trained to use the Spectrum Scale, a scale consisting of more than 150 points ranging from 0 (representing the complete absence of a particular attribute) to 15 (representing extremely strong intensity of that attribute) or even higher, to evaluate odors. Tr. 87:19-25. This was done by using benchmarks – in this case spruce oil at different

---

[3] *See, e.g., U.S. v. Sutton,* 795 F.2d 1040, 1057 (Temp. Emer. Ct. App. 1986) (admitting testimony of the government's principal audit witness, who had supervised and summarized the work of the auditors who worked on the project); *Four Star Capital Corp. v. Nynex Corp.*, 183 F.R.D. 91, 104-05 (S.D.N.Y. 1997) (permitting testimony on the nature of an individual's activities by a witness who supervised such activities and to whom the individual reported); *Folio Impressions, Inc. v. Byer California,* 752 F. Supp. 583, 586-87 (S.D.N.Y. 1990) (permitting testimony on the issue of the creation of a design by a witness who oversaw design studio, despite the fact that she did not create the design herself). In the context of false advertising and trademark cases, often times a consumer perception survey is conducted by an expert who designed the methodology and protocol but did not personally administer, or observe the administration of, the test. Those surveys are nonetheless routinely accepted by courts on the basis of the expert's testimony alone. *See, e.g., Procter & Gamble Co. v. Colgate-Palmolive Co.*, 96 CIV. 9123 (RPP), 1998 WL 788802, at *82 (S.D.N.Y. Nov. 9, 1998) (admitting testimony of survey director who designed and oversaw survey, without requiring testimony from other persons involved in details of conducting survey) (citing *Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 931 (7th Cir.1984) ("[T]he testimony of a survey director alone can establish the foundation for the admission of survey results.")), *aff'd*, 199 F.3d 74 (2d Cir. 1999); *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, No. 95 CIV. 7686 (CSH), 1997 WL 543086, at *7-8 (S.D.N.Y. Sept. 4, 1997) (holding that testimony of witness who designed and supervised consumer research survey provided sufficient foundation for survey test results, notwithstanding the fact that witness did not personally administer survey).

concentrations – to teach the panelists what intensity of odor was represented by different points on the scale. *Id.* at 88:25-89:22 (Civille).

It is only during this benchmarking phase of the training that panelists are told that a particular odor should be rated a particular number on the scale – for instance a certain concentration of spruce oil is identified as a "2," while another one is identified as a "5" or a "10." Tr. 89:17-22.[4] About 15 or 20 commercial litter products (both dosed and undosed with cat feces and urine) were also used during training to help panelists learn to discriminate cat waste malodor from other odors they would encounter, such as the fragrances present in those commercial litters. Tr. 100:13-19 (Civille); Supplemental Declaration of Jodi Russell, dated March 27, 2011 ("Russell Supp. Decl."), ¶ 11 & Ex. B.[5] However, commercial litters (either dosed or undosed) were never used as benchmarks or references. In other words, as Ms. Civille testified, during training no one on the panel was ever handed a commercial litter product and told it had an intensity that matched some specific number on the Sensory Spectrum scale. Tr. 90:2-7 (that was "never" done and "[i]t is not the right way to train a panelist"). C&D has not submitted any evidence to contradict Ms. Civille's testimony.

### 3.   C&D Has Not Shown that the Validation of the Panel Created Any Bias

After completing training, the panelists went through a validation process designed by Sensory Spectrum. "The object of this validation was to determine whether or not panelists could detect malodor in different treatments with different amounts of feces and urine at different

---

[4] C&D tries to make much of the fact that Ms. Civille testified that the spruce oil benchmarks were "about" a 2, a 5 or a 10 on the scale, as opposed to exactly those numbers. *See* Pl.'s Hr'g Mem. at 28. But, as Ms. Civille testified, her use of the word "about" referred to the purity of the source used in the sample, not the precision of the scale used to measure it. *See* Tr. 137:9-14.

[5] C&D's witness, Dr. Ennis, agreed that the panelists should be trained on actual litter products in order to differentiate between fragrance and malodor (notwithstanding his earlier testimony to the contrary). *Compare* Tr. 43:21-44:7 *with* 26:22-27:3.

levels for different time periods with a myriad number of cat litters." *Id.* at 135:9-13 (Civille). Thus, the validation process would determine "the ability of the individual panelists and the panelists as a whole, to discriminate differences that exist and to be able to reproduce their data over a series of repeated sessions or tests." *Id.* at 93:6-10 (Civille). Validation helps to ensure that a panel's evaluation of a test sample is reliable, in terms of accuracy and reproducibility. Civille Decl. ¶ 12.

It is this validation phase that engenders the most severe criticisms from C&D. C&D first insists that Sensory Spectrum's method of using a Fresh Step litter product as both the no-malodor sample and (treated with waste) the low malodor sample in validation led to "sensory cues" that caused the panelists to issue low scores automatically when they smelled similar fragrances in later tests, rather than to assess the actual malodor present.

But this theory is pure speculation, not evidence. First, the Jar Test did not involve litter products, fragranced or otherwise.[6] Moreover, none of the panelists ever knew what they were evaluating in the validation phase. They were not told anything about any particular sample, including whether it was the no-malodor control or low-malodor sample. Tr. 95:1-11 (Civille). Nowhere in the Clorox test methodology materials (or anywhere else) does it suggest that the panelists were given such information – a fact that Dr. Ennis, C&D's expert, conceded. *Id.* at 24:14-25 (Ennis); 72:3-7 (Ennis). Indeed, because Clorox relies on its panel for product research and development, a panel that did not accurately assess Clorox's litter products essentially would be useless. Tr. 100:20-101:9 (Civille); Tr. 256:2-10 (Russell); *see also* Civille Decl. ¶¶ 13-14 (Clorox panelists were exposed to many different brands of litter and scents during training,

---

[6] As Dr. Ennis conceded, even if panelists were exposed to a variety of commercial litters during validation, there could be no "specific link" between that practice and the evaluation of the samples in the Jar Test. Tr. 40:19-41:19; *see also id.* at 181:7-10 (Miller testifying that carbon and baking soda, alone, are odorless).

therefore no bias toward a specific product or ingredient would result). The point is that when exposed to the same fragrances again at a later date, panelists would not know what the purpose of the new exposure was, if those samples were dosed or not, or what scores to report. *See* Tr. 98:25-99:18 (Civille).[7]

In sum, C&D's criticisms of the training and validation of the panel do not satisfy its burden of showing that the Jar Test is unreliable.

### 4.   C&D Has Not Shown that the Jar Test Was Administered Improperty

Jodi Russell, Clorox's Department Manager of Research & Development for cat litter and foods, supervised the design of the Jar Test methodology, approved its execution and is accountable for its results. Tr. 245:2-10; Russell Decl. ¶ 6. Although Ms. Russell did not personally conduct the laboratory experiment, which would be unusual for a person in her position, she did receive direct reports as to its administration and results. Tr. 254:5-13 (Russell). Accordingly, notwithstanding C&D's objection, her testimony on the design and execution of the Jar Test is admissible. *See* Note 3, *supra* (collecting case law regarding admissibility of testimony of supervisors as to tasks they did not personally undertake).

C&D insists that "the blind was broken" but there is absolutely no evidence in the record to support this unsubstantiated attack on Clorox's integrity. As Ms. Russell testified, great pains were taken to ensure that the panelists were blind to all aspects of the Jar Test. Tr. 265:9-15; 266:21-25 (Russell). Also, as described above, the panelists were blind to every sample used in training, validation and calibration. *Id.* at 95:4-11 (Civille). For the Jar Test itself, the samples

---

[7] C&D suggests that Ms. Civille was unaware that the panel trained and validated by Sensory Spectrum was intended to be used for claims substantiation. *See* Pl.'s Hr'g Mem. at 23. In fact, the very protocol document that contains Sensory Spectrum's validation methodology also has a significant section on claims substantiation. *See* Russell Decl., Ex. B at D00009-10. Moreover, Ms. Civille testified that it was entirely appropriate for panel evaluation results to be used for claim substantiation. Civille Decl. ¶¶ 6-7.

were prepared and then shielded both with purple paper and a file folder to make sure the panelists could not see what they were evaluating.  *Id.* at 262:9-16; 265:9-15 (Russell); Def.'s Hr'g Ex. D at D00193.  Eleven panelists performed four replications, and followed the same general protocol Clorox uses in administering all of its sensory evaluation tests.   Russell Decl. ¶ 15 & Ex. B; Russell Suppl. Decl. Ex. A.  Sample order and booth assignment was randomized, so that the panelists did not get the samples in the same order or the same booth during the replications.  Def.'s Hr'g Ex. J at D00196.

C&D also claims that Clorox "put its thumb on the scale," purposely administering the Jar Test in a way that biased the results in Clorox's favor.  This is patently untrue.  Not only is there no evidence in the record that Clorox biased the results in its favor, the evidence shows that the Jar Test was designed in such a way that each ingredient had an equal opportunity to perform.  Real (not synthetic) cat feces and unsterilized urine were used.[8]  Tr. 268:20-269:2 (Russell).  Exactly the same amount of feces and urine was added to each of the jars.  *Id.* at 267:24-268:7.  The feces was prepared in a flat jar lid in order to allow a substantial and uniform surface area to interact with the carbon and baking soda.  Def.'s Hr'g Ex. D at D00193.  Clorox also ensured that there was sufficient baking soda in the jar to completely dissolve the urine.  Tr. 259:20-23 (Russell).  The jars also contained the same *volume* of carbon and baking soda, notwithstanding that this led to there being over three times more baking soda (by density) in the jar, which if anything gave an advantage to baking soda.  *Id.* at 267:13-16; Def.'s Hr'g Ex. D at D00192.

---

[8] As Ms. Russell testified, ensuring the waste was fresh (and therefore realistic) was one of the reasons that Clorox conducted the Jar Test at its offices, which are very close to the facility where the waste is collected.  Tr. 246:20-24.  This practice of using real, rather than synthetic, substances, is supported by the ASTM publication cited by C&D in situations where chemical interactions – for instance, adsorption and neutralization – are at issue.  Pl.'s Hr'g Ex. 4, ¶ 9.2.1

Once prepared, the jars sat for a period of between 22 and 26 hours, which allowed each material to interact with the waste, and replicated consumer behavior of scooping the litter box once a day. Russell Decl. ¶ 12 n.3. The time frame of the test could have been shortened, but given the complexity of cat waste malodor, Clorox concluded that 24 hours would provide a fair and unbiased opportunity for each substance to perform. Tr. 272:7-22 (Russell).

In sum, the record contains ample evidence of the care Clorox took to ensure that the Jar Test was blind and not biased in favor of carbon.

### 5.   Clorox's Design and Supervision of the Jar Test Does Not Render it Unreliable

At the Hearing, this Court questioned Clorox's decision not to have an outside company design and implement the Jar Test. Tr. 125:20-126:4. But there is no evidence that Clorox's design and supervision of the Jar Test impacted its reliability.

First, as a factual matter, much of the design and implementation of the Jar Test was performed by outsiders. The Jar Test relies on a sensory evaluation panel that was trained, validated and calibrated according to the methodology of Sensory Spectrum, an independent company that C&D itself has relied upon to assist in evaluating cat waste malodor. Tr. 109:10-13 (Civille); Russell Decl. ¶ 13 & Ex. B; Civille Decl. ¶¶ 10-12; Reply Declaration of Raymond S. Brown, dated March 25, 2011 ("Brown Reply Decl."), ¶ 36. Ms. Civille further testified that there was nothing inappropriate in the Sensory Spectrum trained-panel participating in the Jar Test. Tr. 111:23-112:8. The panelists were not Clorox employees, and do not participate in evaluations full-time. *Id.* at 99:19-100:5. Furthermore, because Clorox's studies are blinded, and their objectives are not revealed to the panelists, there is no opportunity for panelists to skew the results to curry favor with Clorox. In that respect, this case is worlds apart from cases where, for example, current employees were used in testing that compared their employer's identifiable

16

product against a competitor's. *See, e.g.*, *Gillette Co. v. Norelco Consumer Prods. Co.*, 946 F. Supp. 115, 122 (D. Mass. 1996) (rejecting plaintiff's in-house study where its own employees evaluated its products against defendant's products, unblinded and without screening such employees for bias, awareness of the litigation or familiarity with defendant's advertisements).

Moreover, the mere fact that an advertiser is involved in the product test supporting a claim is insufficient to show bias. For example, in *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 181-82 (S.D.N.Y. 2004), the court held that the plaintiff had failed to carry its burden of proving literal falsity, specifically rejecting the plaintiff's argument that the defendant's study was inherently unreliable because a significant number of the study participants were employees of the defendant. *See also Playtex Prods., Inc. v. Gerber Prods. Co.*, 981 F. Supp. 827, 829-30 (S.D.N.Y. 1997) (accepting (without discussion) an in-house test as adequate claims substantiation). There is nothing about Clorox's involvement in the design or implementation of the Jar Test that renders it unreliable.

### 6. No Adverse Inference May Be Drawn from the Absence of First-Hand Testimony about the Actual Conduct of the Jar Test

C&D further attempts to discredit the Jar Test by arguing that Clorox failed to produce a witness who "claimed to have conducted, participated in or observed the training and validation." Pl.'s Hr'g Mem. at 21. Moreover, bearing in mind the limited scope and duration of the Hearing, Clorox selected those witnesses with the most knowledge about the training, design, execution and analysis of the Jar Test. Ms. Russell and Ms. Civille were the most appropriate individuals to testify for Clorox and Sensory Spectrum, respectively, due to their direct and supervisory experience. *See, supra*, Note 3 (supervisors may testify as to tasks they oversaw). C&D also had ample opportunity to cross-examine Clorox's witnesses, as well as to call any other witnesses it wanted to in order to support its claim.

17

Once again, C&D's argument confuses who bears the burden of proof. C&D always bears the burden in this proceeding of disproving the reliability of the Jar Test, and no inference can be drawn from Clorox's decision to call Ms. Russell and Ms. Civille, instead of those who report to them, to testify, particularly at this stage of the litigation. Although courts have recognized a general rule that a party's failure to produce evidence within its control supports an inference that the evidence would have been harmful to its case, this inference does not apply where the party has good reason to believe that its adversary has failed to meet its burden of proof. *Bank of Crete, S.A. v. Koskotas*, 733 F. Supp. 648, 654 (S.D.N.Y. 1990); *see also Armstrong v. Commerce Tankers Corp.*, 311 F. Supp. 1236, 1241 (S.D.N.Y. 1969) ("A defendant, if so advised may well let the case go to the jury on the weakness of the evidence presented by a plaintiff, who has the burden of proof without being taken to task for failure to call certain witnesses, or have any adverse inference drawn which would not follow from an entire failure to refute the evidence introduced.") (citing *Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A.*, 32 F.2d 209, 210-211 (2d Cir. 1929)), *aff'd* 423 F.2d 957 (2d Cir. 1970). Thus, again, C&D has failed to provide a basis for disregarding the Jar Test.

### 7.    There is an Acceptable Level of Variation in all of the Jar Test Results

Going back to the oral argument on this motion held on March 28, 2011, this Court raised questions about whether there was too much intrapanelist or interpanelist variation in the Jar Test results for the Test to be reliable. The answer to that question is no, as C&D conceded at the Hearing when it agreed that the results of the Jar Test are statistically significant. Tr. 214:10-215:12.

Mr. Carr, the independent statistician who analyzed the raw data from the Jar Test, has over 30 years of experience analyzing and planning sensory studies (including statistical analysis of data), has co-authored two textbooks on sensory evaluation, has participated on the ASTM

committee for sensory evaluation and has reviewed articles in peer-reviewed journals. Tr. 205:5-206:9 (Carr); Declaration of B. Thomas Carr, dated March 24, 2011 ("Carr Decl."), ¶¶ 1, 3. Mr. Carr analyzed the data from the Jar Test and concluded, after applying well-accepted statistical methodology, that the data demonstrates that "the sample treated with activated carbon had significantly lower total malodor than the other two samples in the test." *Id.* at 209:3-7; Carr Decl. ¶ 10.

With respect to the question of the variability of specific data points within a particular panelist's rating or between panelists, all of the experts agreed that the range of scores in the Jar Test was typical, and did not render it unreliable. C&D's witness Dr. Ennis testified that it is not unusual to see considerable variability (even variability of scores ranging from 0.7 to 3.8 for the same sample) in this type of sensory testing. Tr. 47:24-48:12. Ms. Civille likewise testified that it "would be a bit surprising, but not unusual to see some type of range like that." *Id.* at 101:10-18. Mr. Carr testified that out of the 88 data points (for the untreated control and baking soda samples), only two seemed "extreme." *Id.* at 221:3-6. And Mr. Carr went on to testify that studies like the Jar Test are designed with multiple assessors so that if there are extreme ratings, they cannot have an undue impact on the overall results. *Id.* at 221:13-16. Once again, Mr. Carr's analysis of the Jar Test data took into account the variability among data points in determining the extent to which the average results had to differ from one another in order to be statistically significant. He concluded that the Jar Test results demonstrated to a 95% level of confidence that the differences between the untreated sample and the sample treated with baking soda alone, as well as the differences between the baking soda and carbon samples, could not have happened by chance. Carr Decl. ¶ 10; Carr Suppl. Decl. ¶¶ 12-13.

C&D now argues not that there is too much variation among the panelists' scores, but instead that there is too little. C&D claims that the fact that each of the eleven panelists rated the

carbon sample a zero is "implausible and inexplicable" in a fairly run test, and that this fact

compels the conclusion that somehow or other the panelists became "unblinded" as to the

identity of the samples, and they or Clorox skewed the results.  Pl.'s Hr'g Mem. at 16, 18.

However, C&D's rhetoric and attacks on Clorox's integrity are not sufficient to overcome the

testimony of witnesses with extensive experience in the sensory evaluation field, that it is not

unusual to see scores of all zeroes from trained panelists if no stimulus is detectable.  Tr. 107:1-

108:1 (Civille); 221:17-222:3 (Carr).  As Ms. Civille testified, where no stimulus is present, "the

answer is zero.  And I teach my panelists and my associates, zero is a real number."  *Id.* at 107:1-

15.

    The fact that the panelists sensed a very low level of malodor (0.1) in the "empty booth"

during validation (*see* Russell Decl., Ex. B at D00013) does not lead to the inescapable – or even

plausible - conclusion that the panelists were unblinded in the Jar Test.  That some panelists on

that particular day sensed some malodor is exactly the reason why samples are evaluated

multiple times by multiple panelists.  All of the experts agree that humans are "noisy"

instruments, and that there can be some variation from panel to panel and day to day, but in and

of itself, that does not mean that in a situation where no malodor is discernable, a panel cannot

rate a sample zero across the board.[9]  C&D is basically saying that Clorox cheated – but Clorox

only could have obtained such consistent results if its cheating involved changing all of the

"real" scores to zero, or telling the panelists which booth contained the carbon sample, and that

they should rate that booth as zero no matter what they smelled.  These would be quite stunning

---

[9] The same goes for C&D's conjecture that because there was a very slight "total intensity" score
in the carbon booth, Clorox must have cheated.  Panelists are scrupulously trained to rate
malodor if they smell it, and in this particular study, they sensed no malodor.  Again, it would do
no good for Clorox in its research and development efforts to have panelists who did not provide
honest and accurate results.  Tr. 256:2-10 (Russell).

accusations to make, with no supporting evidence, against a responsible company and its employees.[10] *See, e.g., Avis Rent A Car System, Inc. v. The Hertz Corp.*, 782 F.2d 381, 383 n.6 (2d Cir. 1986) (rejecting plaintiff's argument that an "overnight" surge in defendant's car inventory of approximately 7,000 cars was "incredible and cast doubt on the accuracy of the figures," where "the record afford[ed] no ground for discrediting those figures."). The better explanation is the one proffered by Clorox: Carbon is remarkably effective at cat waste malodor absorption, and the zeros resulted from a properly trained panel rating the absence of malodor as zero.

The post-hearing declaration of Dr. Ennis does nothing to support C&D's contentions with respect to the zero results. As Mr. Carr stated in his post-hearing declaration, submitted solely to respond to Dr. Ennis's declaration,[11] none of the experiments described in the exhibits to Dr. Ennis's declaration relate to descriptive analysis, trained panelists or rating intensities on a scale. *See* Post-Hearing Declaration of B. Thomas Carr, dated July 12, 2011 ("Carr Post-Hr'g Decl."), ¶ 2. Thus, Dr. Ennis's cites have absolutely no relevance to the question of whether

---

[10] In particular, C&D's vicious assaults on Ms. Russell are unnecessary, baseless and offensive. Ms. Russell testified in great detail about her role with respect to the Jar Test. C&D had ample opportunity to cross-examine Ms. Russell at the Hearing, but was unable to catch her in any untruths, misstatements or exaggerations, to prove any wrongdoing by her or her lab, or to show that Ms. Russell was anything other than completely candid, truthful and forthcoming.

[11] Clorox objects to the admission into evidence of the post-hearing declaration submitted by Dr. Ennis and the exhibits attached thereto. C&D had ample opportunity in the multiple rounds of submissions in this case, through direct testimony and in cross-examination of Clorox's witnesses (including Mr. Carr), to introduce evidence and to rebut the evidence and testimony submitted by Clorox. Furthermore, counsel for C&D represented to the Court that Dr. Ennis's declaration would only address "the degree of variation among the sensory panels" discussed by Mr. Carr. Tr. 303:9-20. Dr. Ennis's post-hearing declaration goes well beyond this narrow topic, addressing Ms. Civille's testimony regarding the ratio properties of the Sensory Spectrum scale, reiterating Dr. Ennis's incorrect CV calculations, and attaching 85 pages of new and irrelevant exhibits. For these reasons, the post-hearing declaration of Dr. Ennis should be excluded from the record.

panelists who have been trained to detect and rate cat waste malodor will give false positives under the specific circumstances of the Jar Test.[12]

Finally, it is noteworthy that one of C&D's primary bases for attacking the zeros in the Jar Test is by reference to a prior jar test Clorox conducted (without an untreated control) where the treated carbon sample was rated as having miniscule amounts of malodor (less than 0.1 on the Sensory Spectrum scale). In other words, C&D attempts to show the lack of reliability of the Jar Test used to support the Commercial by referring to another test that also demonstrated both the efficacy of carbon and its vast superiority over baking soda (which received almost exactly the same rating in both tests at absorbing cat waste malodor). *See* Carr Post-Hr'g Decl. ¶ 3.

**B.      The Jar Test Is Valid Because it is Directly Relevant to the Claim in the Commercial that Carbon is Better Than Baking Soda at Absorbing Cat Waste Malodor**

C&D also has not shown that the Jar Test is not valid; in other words, that even if the Jar Test is reliable, it "do[es] not establish the proposition asserted by the defendant and [is] thus simply irrelevant." *Zeneca Inc.*, No. 99 CIV. 1452 (JGK), 1999 WL 509471 at *32 (citation and quotation omitted). As discussed *supra*, the literal message of the Commercial is that carbon is more effective than baking soda at absorbing cat waste malodor. The Jar Test, which compares carbon and baking soda head-to-head on their ability to reduce cat waste malodor, is thus directly on point.

Unable to assail this logic, C&D reverts to its argument that the Commercial literally expresses much more, including (as discussed above) that all Fresh Step litters are superior to all Arm & Hammer litters and that Arm & Hammer litters are barely effective at all. C&D then

---

[12] Similarly, while Dr. Ennis testified at the Hearing that in some unspecified situations 15% of consumers will report an odor when none is present (Tr. 55:23-54:7), he admitted that those situations did not involve trained sensory experts and that he was not aware of any studies involving trained sensory evaluators. *Id.* at 69:2-70:4.

attempts to build on this faulty premise by arguing that the Jar Test is not valid because it cannot support such claims – claims that Clorox is not even making.

Integral to C&D's argument is the notion that there is something inherently wrong with comparing the active ingredients of two competitive products without comparing the entire products themselves. But tests comparing ingredients or attributes like the Jar Test are common and appropriate in advertising. Tr. 112:25-113:9 (Civille); *cf. Munchkin, Inc. v. Playtex Prods., LLC*, No. CV 11-00503 AHM (RZx), 2011 WL 2174383, at *8 (C.D. Cal. Apr. 11, 2011) (use of a single odorant, ammonia, to test a diaper pail's odor fighting capabilities did not undermine the test's reliability).

The cases cited by C&D for the proposition that testing must replicate the same ingredients or proportions as in the product being sold are easily distinguishable. In *McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.*, the defendant's advertisement claimed that its product, Advanced Formula Excedrin, worked better than its competitor's product, Extra Strength Tylenol. 938 F.2d 1544, 1546 (2d Cir. 1991). In support of its claim of falsity, the plaintiff attempted to introduce studies that tested products, combinations of ingredients and dosages that were not implicated by the claim in defendant's advertisement. *Id.* at 1546-47. The Second Circuit affirmed the district court's finding that these studies were not probative of the truth of the claim. *Id.* at 1550. Similarly, in *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1313-14 (11th Cir. 2010), the court found that the subject matter of the test (the rate of decay of wooden fence posts treated with a particular preservative) did not correlate with the broad claims in the advertisement (the safety and integrity of structures treated with the preservative), and in *Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 278 (D. Del. 2010), the court found that the advertiser's test could not be used to support its claim where the tested products significantly differed from those advertised in terms of formulation and

delivery mechanism. *Cf. Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co.*, 198 F.

Supp. 2d 59, 68-69 (D. Mass. 2002) (accepting as claim support the results of lab test measuring

golf ball balance that used an artificially fast surface, despite fact that such surface exaggerated

any pull the ball would have toward its heavier side).

Here, the Jar Test measured exactly what is claimed in the Commercial: the relative

efficacy of carbon versus baking soda on cat waste malodor absorption.  But even if the

Commercial did literally contain the variety of messages regarding litter that C&D ascribes to it,

C&D has not sustained its burden of showing that the Jar Test is irrelevant to those claims.  C&D

offers only the testimony of Dr. Seth Miller in its effort to establish that the carbon in Clorox's

litter products performs differently than it does in the Jar Test.  As shown below, Dr. Miller's

testimony falls well short of proving that point.

### 1.    Dr. Miller Admits that Carbon Does Absorb Odors Better Than Baking Soda In "General" Use

As an initial matter, there is scientific evidence that carbon is better at absorbing odors

than baking soda (or technically speaking, adsorbing odors better than baking soda can neutralize

them) across the board.  That is because the surface of activated carbon is uniquely suited to

attracting and capturing a wide variety of odor-causing molecules through the process of

adsorption. *See, e.g.,* Declaration of Dr. Teresa J. Bandosz, dated March 24, 2011 ("Bandosz

Decl."), ¶¶ 7-8; Tr. 148:19-24 (Miller); 247:21-248:5 (Russell).[13]  "Carbon has a very high

surface area," in fact five grams of carbon has the surface area of an entire football field, and

---

[13] Based on her extensive work in the field of carbon adsorption of malodors, and her knowledge of the process by which carbon and baking soda each work to control odor, Dr. Bandosz states that she "strongly believe[s] that active carbon is far superior at odor removal than sodium bicarbonate (commonly known as baking soda).  This is due to the significant chemical and physical differences between those materials, with the adsorption abilities of active carbon making it significantly more effective at eliminating odor than the neutralization abilities of baking soda."  Bandosz Decl. ¶ 4.

therefore a vast capacity to receive and trap odor molecules. Tr. 161:10-13 (Miller); *see also*

Bandosz Decl. ¶ 7. By contrast, baking soda works on odors by neutralizing them – it reacts

only with strong acids and a few strong bases to form non-volatile salts. Tr. 258:3-12 (Russell);

165:25-166:3 (Miller). As a result, even Dr. Miller agrees that, literally speaking, carbon

absorbs odor better than baking soda. As Dr. Miller testified:

> THE COURT: The commercial . . . says that carbon is more effective at
> absorbing odors than baking soda. It doesn't specify which odors, even though
> it's of course in the context of particular odors. So, are you saying that that is
> true? If we just take . . . the literal message is that carbon is more effective at
> absorbing odors than baking soda. If we just were to focus on that without
> context, is that true?

*      *      *

> THE WITNESS: Yeah. In the abstract, people tend use carbon filters and carbon
> media to absorb odors more often than baking soda. It is a more general purpose
> absorbent than baking soda.

Tr. 157:17-158:3, 158:22-25; *see also id.* at 181:21-23 (Miller) ("[C]arbon outperforms many

materials for general odor use, because of its very high available surface area when completely

active.").[14]

### 2.    The Speculative Testimony of Dr. Miller on the Performance of Carbon in Clorox's Litter Should be Disregarded or Afforded Little Weight

Dr. Miller made three arguments as to why the carbon efficacy depicted in the Jar Test

would not translate to Clorox's litters. They were that: (1) carbon absorbs so much of the

fragrance in Clorox's litter that it is completely saturated and unable to absorb any cat waste

malodor; (2) carbon is bound to the clay in Clorox's litter and therefore has reduced surface area

---

[14] This is another reason why it is no surprise that the panelists detected no odor in the carbon
jars – based on its molecular structure, carbon performed exactly as expected. It adsorbed all of
the available malodor molecules, leaving nothing to detect.

for odor absorption; and (3) carbon takes a long time to work, longer than baking soda, so the 24-hour waiting period in the Jar Test favored carbon.  Tr. 156:4-21.

Each of these arguments suffers from the same fatal flaw: none are based on *any* scientific test, analysis or measurement:  Dr. Miller's testimony pertaining to cat litter is sheer speculation.  Taking first the issue of whether the carbon's efficacy was compromised by absorbing the fragrance in Clorox's litter, Dr. Miller admitted that he had done no measurement of any such alleged compromise:

> THE COURT:  I thought you told us earlier you really don't know how much area is left and how much has been . . . absorbed . . . .
>
> THE WITNESS:  Yeah, I haven't done the measurement.

*Id.* at 184:18-20, 24.

Similarly, he did not test in any way his speculation that carbon's efficacy was compromised by binding it to litter clay:

> A.  The carbon can certainly have surface areas still available.  And I'm merely stating that carbon's surface area will be reduced by the binding.
>
> Q.  How much will it be reduced[?]
>
> A.  Again, I don't have measuring numbers on the carbon in this context.

*Id.* at 188:20 – 25.

He also testified that he could not even say, with any degree of certainty, that the carbon was materially affected by any such binding:

> Q.  [W]hat evidence [do] you ha[ve] . . . that the carbon in Fresh Step litter, as bound to the clay particles, was materially changed in terms of its ability to absorb odor?
>
> A.  I have no direct measurements on the Fresh Step litter.

*Id.* at 189:15-19.

Finally, he testified that he had done no tests to establish how long it takes the carbon to absorb malodor in the Jar Test, or that carbon takes longer than baking soda. He based that criticism solely on unidentified "papers" relating to "mercury sorbents" that were not supplied to Clorox or to the Court, which supposedly confirmed that carbon can take hours, in certain situations, to absorb. *Id.* at 192:8-16. In contrast, Ms. Russell testified that based on her experiments with carbon and cat waste malodors, the carbon sample works in a few minutes. *Id.* at 272:11-18 (Russell).

Dr. Miller freely admits that all he did to form his entire opinion was to open and pour a box of Fresh Step Scoopable, and smell the fragrance. *Id.* at 184:25-185:2; 162:18-21; 163:17-23. This type of anecdotal testimony should not be given any weight by this Court, regardless of Dr. Miller's credentials. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357, 359 (2d Cir. 2004) (affirming exclusion of expert opinion where opinion which could not be quantified, tested or verified); *Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8046 (WHP), 2003 WL 21242769, at *10 (S.D.N.Y. May 28, 2003) (excluding as unreliable testimony of OB/GYN whose opinion was based on "anecdotal conversations" with patients rather than survey or scientific study); *Faryniaz v. Nike, Inc.*, No. 00 CIV. 2623 (NRB), 2002 WL 1968351, at *3 (S.D.N.Y. Aug. 23, 2002) (precluding testimony on causation based on expert's visual inspection of running shoes, notwithstanding his vast experience in running biomechanics, because his conclusions were not supported by verifiable tests). Moreover, there was no evidence submitted as to the source, age, maintenance or chain of custody over the single box of product Dr. Miller examined.

Dr. Miller answered to the testimony by Ms. Russell that Clorox uses a proprietary process to prevent the fragrance in its litter products from being absorbed by the carbon (Tr. 250:14-251:18 (Russell – sealed testimony) by again speculating that the carbon would

nonetheless be compromised by movements of the box during shipping. But, once more, he admitted that he had not done any testing or measurements to corroborate that speculation. *See* Tr. 298:10-300:25 (Miller - sealed testimony).

C&D also did not offer any evidence to link the basis of Dr. Miller's testimony – familiarity with general scientific principles and the behavior of carbon in other contexts – to his conclusions with respect to carbon's performance in cat litter. Although "[t]rained experts commonly extrapolate from existing data . . . nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002) ("[W]hile studies involving similar but not identical situations may be helpful, an expert must set forth the steps used to reach the conclusion that the research is applicable.")

It is clear that Dr. Miller lacks the qualifications necessary to opine regarding the reliability and validity of the Jar Test. Rule 702 of the Federal Rules of Evidence requires that an expert witness's opinion may be considered if "(1) the testimony is based upon sufficient facts or data, (2) [it] is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Dr. Miller is not an expert in carbon absorption. Tr. 178:5-6. He has no familiarity with the ability of carbon or baking soda to absorb cat waste malodor. *Id.* at 178:15-17. *Compare Santoro ex. rel. v. Donnelly*, 340 F. Supp. 2d 464, 478 (S.D.N.Y. 2004) (permitting expert testimony on the safety risk of fireplace heaters based on the expert's education and extensive experience with gas-fired consumer products). He is "not an expert on cat waste," he does not even know what the odor-causing molecules are in

cat waste. Tr. 193:2-6, 193:9-11. Dr. Miller's testimony should be excluded, or afforded very little weight, based on his lack of qualifications and the speculative nature of his conclusions.[15]

In sum, the literal message of the Commercial is that carbon is more effective than baking soda at absorbing cat waste malodor. There is no question that the Jar Test is relevant to supporting Clorox's claim, and Dr. Miller's testimony does not sufficiently satisfy C&D's burden of showing invalidity.

**C.    The Dramatization Accurately Depicts the Relative Efficacies of Carbon and Baking Soda at Absorbing Cat Waste Malodor**

The Dramatization visually depicts the results of the Jar Test. It shows two beakers side by side, one containing a black substance labeled carbon and the other containing a white substance labeled baking soda. Stilwell Decl., Ex. E. At the beginning of the Dramatization, each beaker is filled with green gas, representing 100% of the original malodor (the 2.72 total malodor mean from the Jar Test). Russell Decl. ¶ 36. The gas in the carbon beaker is reduced to nearly zero, dramatizing the 0.0 total malodor mean from the Jar Test. *Id.* The gas in the baking soda beaker is reduced by about one-third, dramatizing the 1.85 total malodor score from the Jar Test, or approximately a 32% reduction. *Id.*

---

[15] C&D notes that Dr. Bandosz did not testify at the Hearing "to rebut Dr. Miller." *See* Pl.'s Hr'g Mem. at 12. There was no need for Dr. Bandosz to "rebut" what Dr. Miller said regarding the mechanisms by which carbon and baking soda absorb odor, or that carbon was superior to baking soda in absorbing odor: on those points, they both agree. As to Dr. Miller's argument that the Jar Test gave an unfair advantage to carbon, Dr. Bandosz could not have opined, because, like Dr. Miller, she conducted no analysis or experiments on Clorox's litters. Moreover, whether Dr. Bandosz testified at the Hearing or not, this Court may accept and rely upon the scientific principles she describes in her declaration. *See Zeneca Inc.*, No. 99 CIV. 1452 (JGK), 1999 WL 509471, at *4.

C&D contends that the Sensory Spectrum scale is not a ratio scale, and that therefore it is improper to claim that there is a specific and calculable percentage difference between two points on the scale, rendering the Dramatization invalid.

But C&D cannot deny that Gail Civille, the person who developed the Sensory Spectrum scale, testified that it is in fact a ratio scale as well as an interval scale, meaning that the differences between any two points on the scale are the same (i.e., the difference between a 2 and a 3 is the same as the difference between an 8 and a 9) and that a rating of 4 on the scale represents a stimulus that is twice as intense as one rated a 2, and so on. Tr. 90:23-25 (Civille) (The Spectrum Scale is an interval scale "[b]ecause the different measurements on the scale are proportional to one another. A four is twice of a two, a ten is twice a five . . . ."). C&D has not shown that Ms. Civille had any reason to lie about a basic property of her own evaluation method, one that she has been using and teaching to others at major universities and companies for 45 years. Tr. 112:20-24. That C&D's expert, Dr. Ennis, baldly testified that the Sensory Spectrum scale is not a ratio scale is insufficient to call into question Ms. Civille's testimony. C&D merely points out the absence of a statement from the ASTM accepting the Sensory Spectrum scale as a ratio scale, but Ms. Civille explained that *no* scale has been accepted as a ratio scale by the ASTM, except in some limited cases. Tr. 137:20-21. She further explained that the Sensory Spectrum scale is treated as a ratio scale by 25 companies in the United States and Europe as well as in peer-reviewed journals. *Id.* at 137:15-138:11.

C&D next argues that the Sensory Spectrum scale does not have an absolute zero, an essential property of any ratio scale. But, once again, Ms. Civille disagreed, testifying that the scale is designed so that in the absence of a given sensory stimulus, the score is zero, and again she was not shown to have any reason to lie about that. Tr. 132:14-15. Finally, as shown in the Post-Hearing Declaration of Mr. Carr, the Sensory Spectrum scale is not, as C&D and Dr. Ennis

would have it, a category scale of the sort where panelists are given a limited number of values to choose from when rating a particular stimulus, and the exhibits Dr. Ennis attaches are irrelevant to that inquiry. *See* Carr Post-Hr'g Decl. ¶ 18 n.1. In short, none of C&D's criticisms or speculations are sufficient to undermine the testimony of Ms. Civille that the scale she developed and has used for 45 years is in fact a ratio scale.

## CONCLUSION

C&D has not carried its burden of proving the unreliability or invalidity of the Jar Test. Instead, it has nitpicked at aspects of Clorox's testing, and suggested (without proof) that Clorox cheated.

With regard to C&D's nitpicking, no one can construct a perfect test, and motivated plaintiffs and their able counsel will always be able to point to something that could have been done differently. But in order to serve as adequate substantiation, the Jar Test need not be perfect, just reliable. *See Procter & Gamble Co. v. Chesebrough-Pond's, Inc.*, 747 F.2d 114, 117-18 (2d Cir. 1984) (noting that there were flaws in both party's tests and analytic methods, but none were sufficiently significant to require rejection of the results); *L&F Prods., a Div. of Sterling Winthrop, Inc. v. Procter & Gamble, Co.*, 845 F. Supp. 984, 1001 (S.D.N.Y. 1999) (tests need not be perfect to be sufficiently reliable); *Norelco Consumer Prods. Co.*, 946 F. Supp. at 127 (finding defendant's testing adequate to support establishment claim after exhaustive review of plaintiff's criticisms of that testing: "After reviewing the design, execution and results of the final study, the court finds that Gillette has raised questions which suggest that the final study may be flawed in several respects. But the flaws do not appear to the court to be so severe that Gillette is likely to succeed in demonstrating that the study as a whole is unreliable."); *see also U.S. v. Glynn*, 578 F. Supp. 2d 567, 572-74 (S.D.N.Y. 2008) (admitting testimony of ballistics

31

expert due to the methodology's sufficient empirical support and notwithstanding its "significant subjectivity").

   And again, in order to obtain the extraordinary relief of a preliminary injunction, it is C&D's burden to prove its allegation that "the blind was broken," not Clorox's burden to prove it was not.  Clorox offered testimony from experienced and credible witnesses with professional reputations who all maintained that the Jar Test was designed, implemented and analyzed in a reliable manner.

   C&D's motion for a preliminary injunction must be denied.[16]

---

[16] Even if C&D had been able to meet its burden of showing a likelihood of success on its false advertising claim, C&D still would not be entitled to a preliminary injunction in this case.  Under the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) and the Second Circuit's holding in *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) a party seeking an injunction in any case cannot rely on a presumption of irreparable harm, but rather must show that it is likely to suffer irreparable harm in the absence of an injunction that cannot be later remedied through monetary damages, that the balance of equities favor the moving party and that the public interest would not be disserved by the grant of an injunction. *See also Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 453-4 (S.D.N.Y. 2011) (strongly suggesting that, in light of *eBay* and *Salinger*, "longstanding precedent" permitting "presumption of irreparable harm" in favor of movant seeking to enjoin false advertising "is no longer permissible and . . . has given way to a new standard").  C&D has not put any such evidence into the record, and thus has failed to make the showing necessary to obtain the extraordinary remedy of injunctive relief.

Dated: New York, New York
July 12, 2011

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____
    Jessie F. Beeber
    Edward H. Rosenthal
    Marisa Sarig

488 Madison Avenue, 10th Floor
New York, New York 10022
Tel.:  (212) 980-0120
Fax:  (212) 593-9175
erosenthal@fkks.com
jbeeber@fkks.com
msarig@fkks.com

*Attorneys for Defendant*