UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
CHURCH & DWIGHT CO., INC.,     :
                               :     CIVIL ACTION NO.:
                               :
              Plaintiff,       :     11 Civ. 1865 (JSR)
                               :
    - against -                :
                               :
THE CLOROX COMPANY,            :
                               :
                               :
              Defendant.       :
---------------------------------------------------------------X

**PLAINTIFF'S POST-PRELIMINARY INJUNCTION HEARING
REPLY MEMORANDUM OF LAW**

**PROSKAUER ROSE LLP**
Lawrence I. Weinstein (LW-0792)
Richard M. Goldstein (RG-8329)
Alexander Kaplan (AK-4207)
Eleven Times Square
New York, NY 10036
Tel. (212) 969-3000
Fax (212) 969-2900
lweinstein@proskauer.com
rgoldstein@proskauer.com
akaplan@proskauer.com
*Attorneys for Plaintiff*
*Church & Dwight Co., Inc.*

Dated: New York, New York
July 19, 2011

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................................. 1

**ARGUMENT** ............................................................................................................................... 2

I.   The Commercial Literally Claims Ingredient *and* Litter Superiority ...................... 2

II.  The Jar Test is Irrelevant Because it Does Not Prove That Carbon in Litters Eliminates Cat Waste Odors Better Than Baking Soda ........................................... 4

III. The Results of the Jar Test Are Unreliable .............................................................. 6

IV.  The Demo Falsely Depicts the Relative Performance of Carbon and Baking Soda ........................................................................................................................... 8

V.   The Commercial's Claim That Fresh Step Litters Eliminate Cat Waste Odors Better Than Litters with Baking Soda is Literally False ........................................... 9

**CONCLUSION** ......................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Castrol, Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993)..................................................................................................2

*Castrol, Inc. v. Quaker State Corp.*,
   977 F.2d 57 (2d Cir. 1992)................................................................................................4, 7

*Gillette Co. v. Wilkinson Sword, Inc.*,
   1991 U.S. Dist. LEXIS 21006 (S.D.N.Y. Jan. 9, 1991).................................................2, 3

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
   930 F. Supp. 753 (E.D.N.Y. 1996) ..............................................................................2, 3, 10

*Schering-Plough v. Neutrogena Corp.*,
   702 F. Supp. 2d 266 (D. Del. 2010)......................................................................................4

*Star-Brite Distrib., Inc. v. Kop-Coat, Inc.*,
   664 F. Supp. 2d 1246 (S.D. Fla. 2009) .................................................................................4

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
   497 F.3d 144 (2d Cir. 2007)..................................................................................................2

## PRELIMINARY STATEMENT

Clorox contends that the only message it intended the Commercial to communicate is that "carbon is more effective than baking soda at absorbing cat waste malodor." Post-Hearing Mem. ("PHM") 2. Clorox says the Commercial is not about the efficacy of cat litter, or even of carbon and baking soda in litters, and that the Jar Test "has nothing to do with litter." *Id*. 3-4, 22-23; June 17 Tr. 176:19-177:2. That argument is disingenuous in the extreme. Documents produced by Clorox show that the Commercial was in fact designed to tell consumers why Fresh Step *litter* allegedly eliminates cat waste odors better than Arm & Hammer. Putting aside Clorox's impropriety in making an argument explicitly belied by its own documents, in this Circuit, Clorox's intended messages are highly probative of the Commercial's literal meaning.

Under the analysis required in this Circuit, it is plain that, in addition to the ingredient superiority message, the Commercial necessarily implies a litter superiority message. Any rational litter purchaser watching the Commercial would necessarily conclude that Clorox's litter is superior at eliminating odors. This Court needs no survey to find what common sense dictates. Because the parties' litter tests disprove the litter superiority claim, the Commercial must be preliminarily enjoined. *See* Point V. The same is true for the ingredient superiority claim, which is a separate basis for a preliminary injunction. *See* Points II-IV. Clorox concedes this claim is an establishment claim. Church & Dwight ("C&D") has shown that the Jar Test does not establish this claim with reasonable certainty because: (i) the results are unreliable (C&D PHM 15-25); (ii) the results are irrelevant because they do not reflect how carbon performs in litters (*id*. 7-15); and (iii) the Commercial's Demo is false because the Spectrum scale on which it is based is not a ratio scale. *Id*. 26-28. In trying to rebut these points, Clorox mischaracterizes the law, C&D's burden of proof and the record; hides behind its refusal to produce relevant

documents and knowledgeable witnesses; and relies on conclusory "because I say so" testimony by Ms. Civille, Mr. Carr and Ms. Russell that is inconsistent with the evidence of record.

## ARGUMENT

I.   **The Commercial Literally Claims Ingredient *and* Litter Superiority**

C&D's position as to the Commercial's literal messages has not shifted. Besides the ingredient superiority claim, the Commercial also necessarily implies a literal claim of litter superiority and (through the Demo), a literal claim about the extent of superiority. *See* C&D PHM. 4, 6, 26-30. C&D has advocated this position from the outset. *See, e.g.,* C&D March 25 Reply Mem. 3-4, 7. Further, the necessary implication doctrine clearly applies even when an ad contains multiple messages. *E.g.*, *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 941, 946 (3d Cir. 1993) (finding literal claim of superiority in preventing "viscosity breakdown" and necessarily implied claim of superior "engine wear"); *Gillette Co. v. Wilkinson Sword, Inc.,* 1991 U.S. Dist. LEXIS 21006, at *6-7, 11-12 (S.D.N.Y. Jan. 9, 1991) (finding literal claim of shaving *strip* superiority and necessarily implied claim of shaving *smoothness* superiority); *S.C. Johnson & Son, Inc. v. Clorox Co.,* 930 F. Supp. 753, 756, 781-84 (E.D.N.Y. 1996) (finding literal claims of cockroach killing superiority and degree of superiority, and necessarily implied claim that consumers would experience that degree of superiority). Finally, while an implication must be unambiguous to be "necessary," ambiguity may be found *only* if there are multiple *reasonable and conflicting* interpretations of an ad's meaning. *See Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). There is neither conflict nor ambiguity in this case.

In examining the Commercial's literal meaning, the message Clorox intended to communicate is also highly probative. Contrary to Clorox's argument that intent is irrelevant, the cases consistently recognize its relevance. *See* cases cited at C&D PHM 3-4. Here, Clorox's

documents unambiguously state that the intended message of the Commercial is that Clorox's "Fresh Step Scoopable has better odor elimination than Arm & Hammer Super Scoop." Apr. 25 Cohen Reply Dec. Ex. C, D0028, D00298, D00325, D00349. These documents also confirm that the purpose of the Commercial's ingredient comparison was to inform viewers why Fresh Step litters are superior to Arm & Hammer ("A&H") litters. *Id*.

Fundamentally, as one Court noted: "The Court should use logic and common sense" in deciding the literal meaning and necessary implication of a commercial by considering its "spoken words and visual images, as well as the type of products it features and the intended audience for those products." *S.C. Johnson,* 930 F. Supp. at 781. This Commercial advertises cat litter to cat litter purchasers. Viewed in this context, the Commercial necessarily implies that, because the carbon in Fresh Step eliminates odors better than baking soda, Fresh Step eliminates odors better than litters with baking soda. Clorox's contention that the Commercial's depiction of the Jar Test "has nothing to do with litter" (Tr. 176:19-177:2) is contradicted not only by its own documents, which show that the Commercial has everything to do with litter, but also by the Commercial's multiple references to litters. No rational cat litter purchaser would understand the Commercial to communicate that carbon performs better than baking soda in jars, but does not make Fresh Step litters better than A&H litters.

Judge Wood's decision in *Gillette Co.,* 1991 U.S. Dist. LEXIS 21006 at *11-14, is closely analogous. There, defendant advertised that a strip on its razor was six times smoother than Gillette's strip. Taking into account the product being advertised, the advertiser's intent and the context of the ads, Judge Wood held that this statement necessarily implied a message of superior shaving smoothness. Likewise here, the Commercial necessarily implies to litter purchasers that carbon's supposed superiority over baking soda makes Fresh Step superior.

II. **The Jar Test is Irrelevant Because it Does Not Prove That Carbon in Litters Eliminates Cat Waste Odors Better Than Baking Soda**

Clorox's PHM misconstrues C&D's burden on the establishment claims. According to *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57 (2d Cir. 1992), C&D must show that defendant's tests either (i) "were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited" (*id*. 62-63), or that, even if reliable, are "irrelevant" because they "do not establish the proposition asserted by the defendant." *Id*. 63. In *Castrol,* it fell to the District Court to determine whether defendant's tests, coupled with its expert's theories, "permitted the conclusion to a reasonable certainty" that the tests established defendant's ad claims. *Id*. Under *Castrol,* this Court's task is to review all of the testimony and other evidence to determine whether it is reasonably certain that the results of the Jar Test are both reliable and relevant. If the Court lacks this certainty, C&D has met its burden.

Clorox does not claim the Jar Test is an industry standard test for any purpose, and concedes that when it created it, Clorox never considered whether carbon might perform differently in litter versus a jar. Tr. 281:13-18. This alone should preclude the Court from finding that the Jar Test establishes to a reasonable certainty how carbon performs in litters.[1] Moreover, C&D's expert Dr. Miller testified that carbon's performance in Fresh Step litter would be "substantially degraded" compared to the Jar Test, principally because the carbon in the litter would adsorb the litter's fragrance in the sealed litter carton, thus substantially impairing its ability to adsorb cat waste odor, and also because the carbon in the litter was

---

[1] See, e.g., *Schering-Plough v. Neutrogena Corp.*, 702 F. Supp. 2d 266, 278 & n. 23 (D. Del. 2010) (test not reliable in part because defendant did not demonstrate industry support for its non-standard test protocol); *Star-Brite Distrib., Inc. v. Kop-Coat, Inc.*, 664 F. Supp. 2d 1246, 1250 (S.D. Fla. 2009) (test not reliable because it was not an industry standard test for the product being tested)

- 4 -

bonded to the litter particles, further reducing the carbon's surface area available for cat waste odor adsorption.  *See* C&D PHM 8-14.

Clorox's contention that Dr. Miller is unqualified and that his testimony was "sheer speculation" is absurd. The efficacy of carbon in adsorbing odor and the circumstances that can impair that efficacy are matters of organic chemistry.  Dr. Miller not only has a Ph.D in organic chemistry from Cal Tech, he is an expert on the scientific principles of how carbon works to adsorb odor (Tr. 200:11-14), and is presently working on a method to control carbon's otherwise indiscriminate capacity to adsorb odor (*id.* 150:8-151:7), which is directly relevant to his testimony.  And, much of what Clorox now refers to as "speculation" was either conceded or not disputed by Ms. Russell, including that: any fragrance released in an enclosed litter carton would be entirely adsorbed by the carbon; frequent releases of fragrance would occur before first consumer use; the bonding of carbon to the litter particles would further reduce the carbon surface area available for odor adsorption, and that if the carbon became saturated via fragrance adsorption, it would be incapacitated.  C&D PHM 10.  Thus, the only disputed issue was not *whether* carbon's performance would be degraded compared to the Jar Test, but *how much*.  On that issue, Dr. Miller's testimony that the degradation was substantial was not "speculation".

First, he observed that in contrast to the Jar Test, where pure carbon was poured directly on the cat waste, the percentage of carbon in the litter was small.  Dr. Miller was fully qualified to draw that conclusion from his observation of the litter, his familiarity with carbon's black appearance and the fact that, if there was substantial carbon in the litter, the litter's color would have been distinctly darker.  *Id*. 11. Notably, despite that Clorox knows full well how much carbon is in its litters, Ms. Russell never denied the accuracy of Dr. Miller's observation regarding the paucity of carbon in the litter, which she surely would have if it was inaccurate.  *Id.*

- 5 -

Moreover, Ms. Russell testified there is a substantial amount of fragrance in Fresh Step litters (*id.* 10-11), which buttresses Dr. Miller's position that the carbon degradation resulting from fragrance adsorption is substantial. Finally, Dr. Miller opened a box of Fresh Step and clearly smelled the fragrance, which Dr. Miller testified should have been fully adsorbed if the carbon was still active. *Id.* 10. Dr. Miller was also fully qualified to draw that conclusion, based on basic principles of carbon adsorption.[2]

### III. The Results of the Jar Test Are Unreliable

Clorox says (PHM 14) "there is absolutely no evidence in the record" to support Church & Dwight's contention that the "blind was broken" in the Jar Test. Actually, there was ample evidence: Dr. Ennis's opinion that the absence of any variation in the carbon jar results (44 out of 44 zeroes), coupled with substantial variation in the baking soda and cat waste jars, was inexplicable and implausible in a fairly run test, and demonstrated that the "blind" must have been broken. *See* C&D PHM 15-20. This is not "speculation"; it is an opinion from a highly regarded expert based on the other test results in this case, his extensive knowledge of the scientific literature on the psychophysical reasons for variation in sensory evaluations, and his participation in literally thousands of sensory tests. Tr. 6:9-13.

Clorox has no good answer to Dr. Ennis's opinion. Its lengthy discourse that the level of variation in the baking soda and cat waste jars was reasonable (Clorox PHM 18-19) is just a distraction. Dr. Ennis observed that the juxtaposition between the absence of any variation in the

---

[2] The *Bank of Crete* and *Armstrong* cases (cited at Clorox PHM 18) recognize the general rule that a party's failure to provide relevant evidence within its control supports an inference that the evidence would be harmful to it. Here, Clorox failed to disclose both the amount and percentage of carbon in their litters and the documents demonstrating the details of the training of the Jar Test panelists. Contrary to Clorox's conclusory assertion, no exception to that general rule is applicable here. C&D had highly qualified experts whose opinions directly put that information at issue, and Clorox should not be rewarded for playing "hide the ball."

carbon jars and the indisputable variation in the other jars (*see* Chart at C&D PHM 16) was striking.  Whether or not the variation in the other jars is "acceptable" is beside the point.

Carr and Civille disagreed with Dr. Ennis's opinion.  Such disagreements are common, and courts typically consider which expert opinion better coincides with the extrinsic evidence.  *E.g., Castrol,* 977 F.2d at 61-62 (district court credited plaintiff's experts because their opinions were corroborated by independent evidence). Mr. Carr admitted that variation in evaluation of the same sensory stimulus is commonplace even for trained sensory panelists due to a variety of psychophysical reasons.  *See* C&D PHM 16-17.  Yet, at the hearing, Carr and Civille testified for the first time (despite three previous declarations) that such variation would not be expected when there is no malodor -- *i.e.*, no stimulus -- to be detected.  *Id.* 17.

Their testimony is contradicted, and Dr. Ennis's testimony corroborated, by both of the Clorox tests of an "Empty Booth" placebo which contained no malodor at all, but which numerous "trained" Clorox sensory panelists still gave ratings greater than zero.  *Id*. 18-19.  And if, as Clorox contends (PHM 25 n. 14), the reason for 44 uniform zero ratings for carbon is that the carbon "adsorbed all of the available malodor molecules, leaving nothing to detect," then why in an earlier jar test did fully *18%* of the trained sensory panelists give non-zero ratings for carbon?  *See* C&D PHM 18.  The Carr/Civille testimony is also contradicted by scientific literature recognizing that variation is caused not just by changes in the stimulus, but also by factors unrelated to the stimulus.  *Id*. 19-20; Ennis June 29 Dec. ¶ 3 and Exs. 3-5. Carr's testimony that the Ennis exhibits do not involve trained sensory panelists is double talk; the exhibits confirm Ennis's testimony that variation is in part caused by brain "noise" unrelated to the stimulus. Carr's pre-hearing testimony that variation due in part to brain function is to be

expected even among sensory panelists (*see* C&D PHM 16-19) supports Dr. Ennis's position and contradicts the Carr/Civille "no stimulus" exception raised for the first time at the hearing.

## IV. The Demo Falsely Depicts the Relative Performance of Carbon and Baking Soda

Clorox does not dispute that the Demo is invalid if the Spectrum scale is not a ratio scale. Clorox's "evidence" (PHM 30) is that Ms. Civille says it is a ratio scale, and "C&D has not shown that Ms. Civille had any reason to lie . . . ." But the issue is not whether she is lying; it is whether there is a reasonable certainty she is correct. The record does not permit that conclusion. A scale does not become a ratio scale by the fiat of its developer, which is all Clorox has proffered. As Ms. Civille herself admitted, her scale is not recognized as a ratio scale by *any* scientific body. Tr. 137:19-20-138:3. The parties agree that a ratio scale *must* have both an absolute zero and equal intervals. In true ratio scales, like weight and the Kelvin temperature scale, absolute zero is not a matter of perception or uncertainty. By contrast, the fact that Clorox's panelists trained to use the Spectrum scale often give ratings greater than zero when there is demonstrably no odor present, and give zero ratings when other panelists detect odor, means that there is uncertainty as to what constitutes a 0 on that scale. C&D PHM 18, 26-27. Just because a scale is "designed" to produce a score of 0 in the absence of a stimulus (Clorox PHM 30) does not mean this always happens in reality, and Clorox's testing proves it does not.

Nor is there any proof besides Ms. Civille's mere say-so that the intervals on the Spectrum scale are equal. Her testimony indicates that the "spruce oil" references she uses to train panelists are not equal interval references (C&D PHM 28), but even if they are, there is no evidence at all that Clorox (or any other) sensory panelists trained on her method are capable of making equal interval assessments of other odors. Nor is there any evidence that any independent entity has ever validated Civille's claim that her scale has equal interval properties.

Indeed, her and Carr's own book indicates that category scales such as hers are *not* equal interval scales. *See* Carr July 12 Dec. Ex. A at 48 (noting that "No one . . . can answer . . . reproducibly and precisely" whether a "sensation [is] 2x as strong or 3x as strong); *id*. 56 (noting that category scales, which they define as a scale, like the Spectrum scale, "in which the subject is asked to 'rate' the intensity of a particular stimulus by assigning it a value (category) on a limited, usually numerical scale", "do not generally provide values that measure the degree (how much) one sample is more than another").

Mr. Carr attempts to disguise the contradiction between his and Civille's book and their ratio scale testimony by explaining that the Spectrum scale is not actually a category scale because a "category scale usually contains 10 or fewer discrete options for rating the perceived intensity of a test sample and may have no zero," whereas the Spectrum scale has "151 rating points", if one includes decimals. Carr July 12 Dec. ¶ 1. This is just more double talk. There is no rule that category scales must have 10 or fewer intervals, or do not have zeroes. To the contrary, ASTM E1207-09 (Plaintiff's Hearing Ex. 3), which Civille relied on in ¶ 9 of her Apr. 1 Declaration, recognizes that category scales for odor measurement using 0 for no odor have been in use for over 40 years (*id*. § 8.10.1.1), and that category scales can and do have more than 11 points. *Id*. § 8.10.1.4, Note 1. In fact, the ASTM publication notes the disadvantages to category scales, such as the Spectrum scale, that have more than 11 points. *Id*. Finally, the notion that the large number of rating points on the Spectrum scale means it is a ratio scale is ludicrous. The Farenheit scale has thousands of points if one counts decimals, and it is not a ratio scale.

V.   **The Commercial's Claim That Fresh Step Litters Eliminate Cat Waste Odors Better Than Litters with Baking Soda is Literally False**

Clorox cites no authority for its incorrect argument that the litter superiority claim would not be an establishment claim. *See S.C. Johnson*, 930 F. Supp. at 780-81 (rejecting Clorox's argument that only some claims in ad are establishment claims). There are numerous references to litters in the Commercial, including in the Demo which includes the reference to Clorox's test. *See* C&D PHM 29. But in the end it does not matter, because the Commercial's litter superiority claim is not only unsubstantiated, it is false on its face. First, a Clorox test of Church & Dwight's fastest growing litter, Double Duty, determined that there is no significant difference in odor elimination between Fresh Step and Double Duty, either at Day 1 or any time in the first seven days. *Id*. And the independent ABIC study sponsored by Church & Dwight showed Double Duty to be clinically statistically significantly better than Fresh Step on some days, and no worse than equivalent to Fresh Step on any day. *Id*. Moreover, Ms. Russell's principal criticism of the ABIC study, its use of synthetic feces, was subsequently revealed to be baseless. *Id*. 12 n.6. Second, another Clorox litter test, comparing Fresh Step and Arm & Hammer Super Scoop, showed that both products performed excellently, and that the difference in performance was so slight that, according to Ms. Civille, the difference in odor elimination performance could not be detected by consumers. *Id*. 29. Consequently, Clorox's necessarily implied litter superiority claim is false on its face. In addition, through the Green Gas Demo, the Commercial portrays Fresh Step not only as superior to Arm & Hammer litters, but as vastly superior. As previously discussed, exaggerated visual depictions also constitute false advertising, and for this reason as well the Commercial is literally false.

## CONCLUSION

For the foregoing reasons, Church & Dwight respectfully requests that this Court grant a its motion for preliminary injunction.

- 11 -

Dated: July 19, 2011                                                                 Respectfully submitted,


                                                                                     By:   */s/ Lawrence I. Weinstein*

                                                                                     PROSKAUER ROSE LLP

                                                                                     Lawrence I. Weinstein (LW-0792)

                                                                                     Richard M. Goldstein (RG-8329)
                                                                                     Alexander Kaplan (AK-4207)

                                                                                     Attorneys for Plaintiff

                                                                                     Church & Dwight Co., Inc.